STATE of Missouri, Respondent,

v.

Larry G. BROWN, Appellant.

No. 71057.

Missouri Court of Appeals,
Eastern District,
Division Five.

July 29, 1997.

Joseph L. Green, St. Charles, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Joanne E. Joiner, Asst. Atty. Gen., Jefferson City, for respondent.

CRANDALL, Judge.

Defendant appeals from the judgment entered on his convictions by jury of three counts of forcible sodomy, one count of forcible rape and one count of first degree burglary. We affirm.

Defendant does not challenge the sufficiency of the evidence. We view the evidence in a light most favorable to the verdict. *State v. Kezer*, 918 S.W.2d 874, 875 (Mo.App. E.D. 1996).

The victim lived in an apartment and the crimes were committed in the early morning hours shortly after she had gone to bed. According to the victim, her attacker "smelled of alcohol." The police found shoe impressions outside the patio of the victim's apartment and near the parking lot. There were also muddy footprints in front of the patio door and through the living room towards the hallway. The police began speaking to neighbors. While speaking to a person at an apartment that was "catty-corner" and in the same building as the victim's apartment, police noticed mud tracks in the living room and beer cans in a wastebasket. Defendant and another person then walked into the apartment. Defendant had been visiting a friend at this apartment, and arrived the evening prior to the attack and had stayed until the following morning. One of the occupants testified that the occupants left defendant alone in the apartment at about 11:00 or 11:30 p.m. when they went to clean an office building, which usually took an hour and a half to two hours. This witness also testified that her carpet was clean when she left to go clean the offices but when she returned there was mud "all over."

Defendant consented to a police interview and was told the shoes he was wearing were similar to the shoe impressions found at the crime scene. Defendant then told the detective that the impressions were there because upon returning to the apartments after buying beer at a local store he had jumped down an embankment and took a shortcut. A fifty dollar bill, five twenty dollar bills, a ten dollar bill, three five dollar bills and two one dollar bills for a total of $177, were found in defendant's wallet. The victim's roommate had left a fifty dollar bill, two twenty dollar bills and four five dollar bills for a total of $110, on the kitchen table. A store clerk would later testify she cashed defendant's check for $66.50, and gave him three twenty dollar bills, a five dollar bill, a dollar bill and some change. At a bond hearing and at trial,

the victim recognized defendant's voice as that of the person who attacked her. At trial, the State presented evidence of DNA testing.

The jury found defendant guilty of three counts of forcible sodomy, one count of forcible rape and one count of first degree burglary. Defendant was sentenced to consecutive terms of imprisonment of twenty years each for two of the forcible sodomy counts, thirty years for the remaining forcible sodomy count, life for the forcible rape count and ten years for the first degree burglary count.

▮▮▮ Defendant first argues that the trial court erred in overruling his motion for a hearing under *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), and in admitting the DNA probability results. Defendant contends by these rulings he was denied his right to challenge "the scientific foundation and reliability and thus admissibility of the DNA test employed by the State, and said tests have not gained general acceptance within the relevant scientific community and were unreliable and should have been excluded."

A criminalist for the Missouri Highway Patrol testified that he was unable to extract sufficient "high molecular weight DNA" to perform the restriction fragment length polymorphism ("RFLP") method of DNA analysis. The samples were then sent to a private laboratory, Roche Biomedical, for polymerase chain reaction ("PCR") testing. The criminalist testified that the PCR technique is more sensitive and therefore results could be obtained with a smaller sample than it takes for the RFLP method of testing. While at Roche Biomedical, Dr. Richard Guerrieri performed eight PCR based tests, using defendant's and the victim's blood samples and a stain from the victim's underwear. Dr. Guerrieri testified that "through each of the eight different genetic systems that I looked at, DNA information present in the sperm fraction of the underwear stain matched the DNA profile from [defendant's] blood sample at each of those sites." Dr. Guerrieri also testified that finding another unrelated individual at random that would have the same DNA characteristics as defen-

dant and the stain on the underwear would be "roughly" one in 5,500,000 in Caucasians, one in 1,500,000 in African–Americans and one in approximately 300,000 in Hispanics.[1]

The Missouri Supreme Court first addressed admissibility of DNA evidence in *State v. Davis*, 814 S.W.2d 593 (Mo. banc 1991)(applying the *Frye* standard). In that case, the Court held that the RFLP method of DNA analysis is generally accepted in the scientific community. *Davis*, 814 S.W.2d at 602–03. The Court concluded that the trial court did not abuse its discretion in admitting the DNA evidence at issue. *Id.* at 603.

Defendant correctly contends that the Court in *Davis* did not address the PCR method of testing or the methodology for determining statistical probabilities of finding in the population at large any given DNA profile. However, cases decided after *Davis* have found the methods challenged by defendant are generally accepted in the scientific community and the results from these tests are admissible. *State v. Kinder*, 942 S.W.2d 313, 326–28 (Mo. banc 1996); *State v. Huchting*, 927 S.W.2d 411, 420 & n. 3 (Mo.App. E.D.1996); *State v. Hoff*, 904 S.W.2d 56, 59 (Mo.App. S.D.1995).

The Court in *Hoff* considered the defendant's argument that the State failed to establish that PCR testing has achieved general acceptance in the scientific community. *Hoff*, 904 S.W.2d at 59. The court stated that numerous cases in various jurisdictions have found the PCR method of testing to be generally accepted and the test results admissible. *Id.* The court held that the trial court did not err in admitting the result of the tests. *Id.* In addition, Dr. Guerrieri testified in this case that the scientific community generally accepted as reliable the PCR method of testing.

With regard to the methodology for determining statistical probabilities, defendant challenges the reliability of the product rule. The Missouri Supreme Court recently addressed the admissibility of population frequency statistics based on the product rule. *Kinder*, 942 S.W.2d at 326–28. The Court held that the product rule is generally ac-

cepted in the scientific community and that frequency statistics based on the product rule are admissible. *Id.* The Court stated that "Any criticism of the reliability of the product rule or of the particular methods used to apply the product rule pertains only to the weight to be given the DNA evidence by the jury." *Id.*

Defendant also asserts that Dr. Guerrieri's findings did not address lab error rates and therefore the probabilities testified to by Dr. Guerrieri were overestimated, misleading and unreliable. This type of argument goes more to witness credibility and weight of the evidence rather than admissibility of the evidence. *Huchting*, 927 S.W.2d at 418; *See Kinder*, 942 S.W.2d at 327. The trial court did not abuse its discretion by not conducting a *Frye* hearing or in admitting the DNA test results. Defendant's first point is denied.

■ Defendant argues in his second point that the trial court erred in overruling his objection to certain testimony regarding DNA by Dr. Martin Tracey, Jr. Dr. Tracey testified after Dr. Guerrieri and defendant did not object to Dr. Tracey being qualified as an expert. During cross-examination Dr. Tracey testified that calculations that were based on a sample that was contaminated would not be valid. Dr. Tracey testified during redirect examination as follows:

> [PROSECUTOR] Well, what would the percentage—or, the odd[s] in having the suspect's sperm mixed with [the victim's] vaginal fluids on the pair of panties that were analyzed?
>
> [DEFENDANT'S COUNSEL] I would object as calling for speculation, your Honor.
>
> [PROSECUTOR] I think he opened it up, Judge, he's talking about contamination.
>
> [THE COURT] Overruled.
>
> [DR. TRACEY] Well, the calculations that are done—the questions that are asked, for example, the match from the stain on the panties, the first question that is normally asked is, If that sperm stain didn't come from [defendant], what's the chance that you could walk out on the

1. The victim testified her attacker was African–American.

street, pick anybody else at random who's unrelated to [defendant] and have it match, and the most frequent, in my calculations, chance of that is less than one in a million.

Okay. Now, the same kind of argument, since it's a mixed stain, okay, would apply to [the victim] in this case. If that isn't her DNA mixed in with the stain, you have, again, the possibility of a mixture, and going out and picking somebody else at random, which would be approximately—approximately one in a million, but probably less than that. When you ask, What's the chance of taking two people at random—and you have to remember that this stain was deposited on the panties before anybody knew the results of any of the tests, so you would have to know the results of the test to pick the right person, so you're definitely picking them at random, would be, again, one in a million, so one in a million times one in a million is one in a trillion.

[PROSECUTOR] No further questions.

[THE COURT] Is there further cross?

[DEFENDANT'S COUNSEL] No, your Honor.

Defendant argues that the State never made a proper foundation for Dr. Tracey's answer of one in a trillion and this testimony amounted to speculation. Defendant contends Dr. Tracey's opinion was improper because he did not state what database, procedure, protocol or mathematical method he used to arrive at his opinion.

Defendant objected at trial on the basis of the question calling for speculation. Defendant asserts that the foundational argument was raised in a pre-trial conference. During this conference, defendant first argued that Dr. Tracey's testimony would be cumulative to Dr. Guerrieri's testimony. After further discussion regarding Dr. Tracey's proposed testimony and the denial of defendant's motion for a *Frye* hearing, the trial court did state that it was considering defendant's objection as one for lack of proper foundation. The trial court overruled this objection. Defendant never argued the grounds raised on appeal that an opinion of the odds of two persons other than the victim and defendant

having the same DNA profiles as found on the stain was without a proper foundation unless there was testimony as to the database, procedure, protocol and mathematical method, or that there is no scientific basis to give an opinion on this particular matter.

■ This court has held that an objection stated as " 'lack of foundation, subject to my cross' " was inadequate to preserve the issue for review because it was not sufficiently specific to apprise the trial court as to the grounds for excluding the evidence. *State v. Cannady,* 660 S.W.2d 33, 36 (Mo.App.1983); *See also State v. Holland,* 781 S.W.2d 808, 811 (Mo.App.1989). Where the objection is that an inadequate foundation has been laid it is "particularly important" that the objection made be specific because foundation deficiencies can frequently be remedied. *State v. Jones,* 569 S.W.2d 15, 16 (Mo.App.1978). Here, the objection did not apprise the trial court of the specific grounds, as argued on appeal, to exclude the evidence.

■ Even if we assume defendant's objection was sufficient, it is well-settled that any error in admitting evidence is not considered prejudicial where similar evidence is properly admitted elsewhere in the case or has otherwise come into evidence without objection. *State v. Matheson,* 919 S.W.2d 553, 557–58 (Mo.App. W.D.1996). Dr. Guerrieri testified before Dr. Tracey as follows during redirect examination:

[PROSECUTOR] Are there ways you can tell, in your lab, or when you're doing these tests, if something—if a sample has been contaminated?

[DR. GUERRIERI] Well, in the lab, yes. First of all, you take precautions within the lab to try to prevent any type of contamination, but at the same time we're monitoring to determine if there is contamination through using blank tubes and positive controls and a lot of the other little details that I didn't elaborate into too much, but the end result is, in my opinion, from this testing, I see nothing to support that there is any indication of contamination in the sample.

[PROSECUTOR] Somebody—if a person was going to contaminate the samples,

they would have to have a sample of [defendant's] sperm, wouldn't they?

[DR. GUERRIERI] For what I—they would have to have a sample of sperm that is identical to [defendant's], and, again, the chance of finding someone else other than [defendant] that would have this information is those numbers, one in five and a half million in Caucasians, one in one and a half million for blacks and one in three hundred thousand in Hispanics.

[PROSECUTOR] And then going further, what would be the odds on randomly getting a sample of [the victim] to—[the victim's] DNA mixed with [defendant's]?

[DR. GUERRIERI] Well, it's gonna get a little complicated with the numbers, but basically what it's going to boil down to is essentially the chance of finding another individual like [defendant] that would have—whose semen would be like [defendant's] is in the neighborhood of roughly one in a million. The same type of information can be described for [the victim's] DNA profile, it would also be one in a million, so the chance of coincidentally having two other people other than those two come together to mix into this stain would really be the product of those two numbers, one in a million times one in a million, and I'm not sure what that number's going to be.

[PROSECUTOR] It's a big number, isn't it?

[DR. GUERRIERI] It's gonna be—you're gonna still eliminate in excess of 99.999 percent of the population.

[PROSECUTOR] Thank you. No further questions.

[THE COURT] Is there further cross?

[DEFENDANT'S COUNSEL] No, your Honor.

Dr. Guerrieri testified that the chance of coincidentally having two people other than the victim and defendant come together on the stain was "the product of the two numbers, one in a million times one in a million," and he was not sure what that number was going to be. The distinction between Dr. Guerrieri's testimony and Dr. Tracey's, is that Dr. Guerrieri did not make the mathematical calculation of one million times one

million. Dr. Guerrieri's testimony reflects that he was testifying, as was Dr. Tracey, regarding the odds of two random individuals coming together on the stain. Defendant did not object to this evidence and there is no substantial difference between Dr. Guerrieri's testimony and the challenged testimony of Dr. Tracey. Accordingly, any error in admitting the testimony is not prejudicial. Defendant's contention that Dr. Tracey's opinion was without proper foundation fails.

■ Defendant also contends that Dr. Tracey's opinion invaded the province of the jury and amounted to a direct comment on the weight and credibility of the DNA evidence. Defendant asserts that Dr. Tracey's opinion improperly bolstered the State's position "that no errors or mistakes were made at arriving at the match...." Dr. Tracey's opinion was not a direct comment on the validity of DNA evidence but was in response to defendant's argument regarding contamination. Defendant's second point is denied.

No jurisprudential purpose would be served by addressing defendant's remaining points and these points are denied. Rule 30.25(b).

The judgment is affirmed.

AHRENS, P.J., and ROBERT E. CRIST, Senior Judge, concur.