STATE of Missouri, Plaintiff/Respondent,

v.

Joshua C. KEZER, Defendant/Appellant.

No. 66599.

Missouri Court of Appeals,
Eastern District,
Southern Division.

Feb. 6, 1996.

Motion for Rehearing and/or Transfer to
Supreme Court Denied March 11, 1996.

Application to Transfer Denied
April 23, 1996.

Gary E. Brotherton, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Joanne E. Joiner, Asst. Atty. Gen., Jefferson City, for respondent.

GRIMM, Judge.

In this jury-tried case, defendant was found guilty of second degree murder under § 565.021,[1] and armed criminal action under § 571.015. The trial court sentenced defendant to consecutive terms of thirty years. Defendant appeals; we affirm.

Defendant alleges eight points of error. They include the failure of the trial court to disqualify defense counsel[2] because of a conflict of interest, the erroneous admission of evidence, and the giving of an improper instruction.

## I. Background

Defendant does not challenge the sufficiency of the evidence. We view the evidence in a light most favorable to the verdict.

1. All statutory references are to RSMo 1994.

2. Defendant was represented by private counsel at trial and is represented by the public defender on appeal.

Victim Angela Michelle Lawless was a college student from the Benton, Missouri area. She was murdered on November 8, 1992. She spent the evening before her death in Sikeston, Missouri with her friend Lelicia O'Dell. Sikeston is about 15 miles south of Benton. Both are on I–55. Victim dropped O'Dell off at home around midnight. She then went to her boyfriend's house in Sikeston for about an hour, leaving around 1:00 a.m.

At about 1:15 a.m., Mr. and Mrs. Householder found victim's car at the end of the I–55 Benton exit ramp with the headlights and interior lights on. However, they did not see anyone in the car. The Householders reported this to the sheriff's office in Benton. The dispatcher sent two officers to investigate.

Before the officers reached the scene, Mark Abbott exited I–55 at the Benton exit. As he turned off the interstate, he saw a man jump off the side of the road. At the top of the exit ramp, he stopped behind victim's car. After a few seconds, he pulled up beside the car and saw someone slumped over in the front seat. He got out of his truck and went over to the car. He reached in through the window, saw blood, and heard the person make a "gurgling" noise.

Abbott then went across the overpass to a nearby store; it was closed. He used a phone to call 9–1–1, but did not get a response.

While using the phone, a car pulled in and stopped next to his truck. More than one person was in the car. A person later identified as defendant said, "We are going to have to go with you. We are out of fuel."

Abbott responded, "Screw you." He then jumped in his truck and drove to the sheriff's office. He told a deputy about victim and left. Some months later, Abbott picked defendant out of a photo display as the person he talked to by the phone that night.

At the scene, the officers found victim in the front seat of the car. Later, an autopsy disclosed she was shot three times at a close range. The pathologist retrieved two bullets from the body, and a law enforcement officer found the other bullet in the car. These bullets were .380 caliber, and were fired from a .380 or 9 mm handgun. Shell casings for all three bullets were found in the car.

Three people testified for the State about statements defendant made to them. One was Shawn Mangus, who shared an apartment with defendant at the time of the killing. He testified that one day in the apartment, defendant asked him if he "knew the girl that had gotten killed on the Benton exit?" Mangus said he had heard about her. Defendant then said "he was the one that shot her. He said that since we were good friends that he felt that he could talk to me about it."

Another was Steve Grah, Jr. Grah testified that he and defendant were friends and members of a street gang called the All Mighty Latin Kings. They were at a party in January, 1993, and defendant asked to talk to him on the porch. There, defendant said, "I killed this girl." Further, Grah testified that defendant said he killed victim "[b]ecause she would not take him home to Sikeston because the[y] were coming from a party."

Also, Grah testified that defendant said he shot victim three times with a .380 Barretta. Two days after this discussion, defendant showed Grah a .380 Barretta, saying "check out my new gun."

The third person was Wade Howard. He was defendant's cell mate for three to four months while defendant awaited trial. Defendant told Howard "that he felt bad about shooting and killing Michelle Lawless."

## II. Defense Counsel

In his first point on appeal, defendant claims the trial court plainly erred in allowing defendant's attorneys to represent him at trial "because such ruling violated [defendant's] right to conflict free and effective counsel . . . in that [one of his attorneys] was an essential witness to rebut the State's implication that" the attorney acted improperly while interviewing two informants. Defendant claims his attorney's failure to testify "created an actual conflict of interest" which defendant "could not knowingly and intelli-

gently waive ... without receiving advice from independent, conflict-free counsel."

On June 3, 1994, ten days before the scheduled trial setting, the State filed a motion to disqualify defendant's counsel. In that motion, the State alleged that one of defendant's attorneys improperly obtained two statements from Shawn Mangus. In those statements, Mangus recanted his previous statements, and said defendant did not admit any wrongdoing.

The motion further alleged that the attorney told Mangus that Mangus was in danger, defendant was contacting gang-members, and Mangus could avoid problems by recanting. The motion said Mangus advised the State his original statement was correct, and not the later statements.

The motion also concerned witness Howard. It alleged that the attorney also obtained a statement from him, recanting his earlier statement. According to Howard, the later statement contained inaccurate paragraphs. Howard said the attorney told him "to place his initials next to the inaccurate paragraphs." The State alleged that defense counsel's position was that the later statements were accurate.

In its motion, the State anticipated that the attorney who obtained these statements might have to testify to refute the witnesses' explanations. Pointing out that Rule 3.7 of the Rules of Professional Conduct prohibit an attorney from being both a witness and an advocate, the State moved to disqualify the attorney and his law firm.

The trial court heard the motion on June 7. At that time, both the State and defendant presented testimony. Defendant's evidence consisted of two witnesses who witnessed either Mangus' or Howard's signature on their respective recanting statements.

In addition, one of defendant's trial attorneys told the trial court, "we do not intend to call [the witnessing attorney] to the stand in this case, in any way, shape or form." Further, defendant testified and waived any conflict, acknowledging that he "couldn't come along later if [he got] convicted and say that [he was] deprived of [his] right to a proper lawyer, because [his attorney] didn't get up

and testify and state that these fellows were lying, or not telling the truth."

The trial court denied the State's motion. The attorney who took and witnessed the statements did not testify at trial.

Now defendant essentially claims that this attorney was a necessary witness in the case because of his alleged conduct in acquiring the recanting statements of the two witnesses. He claims his trial attorneys were in "conflicting roles: 1) to defend [defendant] and 2) to justify [attorney's] conduct as 'legal and ethical.'"

■ We do not decide this point on the issue as defendant framed it. Rather, we recognize that defendant, in effect, alleges he received ineffective assistance of counsel. A claim of ineffective assistance of counsel cannot be raised in a direct appeal. Rather, the exclusive remedy for such a claim is a Rule 29.15 motion. *State v. Wheat*, 775 S.W.2d 155, 157–58 (Mo. banc 1989). Defendant did not file such a motion, and therefore his claim is not cognizable.

■ Further, if he is claiming trial court error in denying the State's motion to disqualify defense counsel, he does not have standing to do so. Generally, a defendant cannot request relief from this court when that relief was not sought below. *See State v. Chaney*, 663 S.W.2d 279, 285 (Mo.App.E.D. 1983). This is especially so when defendant not only did not seek the relief, but consented to the order and waived any objection to it. *Id.* at 285–86; *State v. Scott*, 858 S.W.2d 282, 285 (Mo.App.W.D.1993).

Here, the State filed the motion to disqualify, not defendant. Defendant testified in opposition to the State's motion. Not only was he examined by his attorney, but the State's attorney extensively cross examined him. Further, the trial court asked him numerous questions and raised hypothetical situations with him. In response to all questions, defendant consistently testified that he wanted to keep his lawyers. In addition, he testified that he waived any rights to different counsel. Also, he acknowledged he "would be giving up forever any right to complain about ineffective assistance of counsel because of this conflict."

Nevertheless, defendant contends that he could not waive his rights without receiving advice from conflict-free counsel. In support, he cites *State ex rel. Fleer v. Conley,* 809 S.W.2d 405 (Mo.App.E.D.1991).

In *Fleer,* an apparent conflict of interest arose between the defendant and his counsel. There, on the State's motion, the trial court appointed independent counsel to review the conflict, consult with the defendant, and make a recommendation to the trial court. *Id.* at 406–07. Upon independent counsel's recommendation, the trial court held a hearing. Defendant testified and waived the conflict. *Id.* at 407. The trial court refused to accept the waiver, and removed the defendant's counsel.

Upon the defendant's request, this court issued a writ of prohibition. We recognized that a defendant "may waive his right to effective, conflict-free counsel, providing his waiver is knowing, intelligent, and voluntary." *Id.* at 409.

Further, we recognized other factors to consider in deciding whether to remove a defendant's counsel. In that case, we noted that the defendant paid for the legal services desired and had no more money, counsel was prepared for trial, and the defendant had been incarcerated a long time pending trial. *Id.* at 410.

Here, the record reflects that the *Fleer* concerns were addressed by trial counsel and the trial court. Although the appointment of independent counsel is salutary and may be the better practice, we decline to mandate its use. Point denied.

### III. Uncharged Crimes

In his second point, defendant claims the trial court erred by allowing evidence that defendant "engaged in uncharged crimes in Benton and Cape Girardeau, Missouri, on October 31, 1992." He points to two separate events for which the State offered evidence.

The first instance concerns one of the State's rebuttal witnesses, Chantelle Crider. During his presentation of evidence, defendant presented three witnesses who testified that defendant was in Bradley, Illinois on October 31. To rebut this evidence, the State indicated its intent to call Crider.

Immediately before Crider testified, defense counsel interviewed her for 30 to 40 minutes. Counsel then objected because she would testify that defendant tried to kiss her. Counsel argued this was inadmissible evidence of an uncharged crime, i.e. sexual assault.

In opposition, the State argued that even if it was an uncharged crime, it was admissible to prove identity. The trial court directed the State "not to go into the fact that he may have tried to kiss her" or "any of the touching." Nothing was mentioned about defendant's overtures to victim.

Crider testified that on October 31, a week before victim was killed, she, victim, and Lelicia O'Dell got together early in the evening. Around 7 or 7:30, they went to a Halloween party in Benton. During the party, defendant came up to Crider and asked her out. She told him no, and he tried to kiss her. She told him no again.

At this point, defense counsel said, "Objection, Your Honor, I move for a mistrial and in the alternative that the jury be instructed to disregard that." The trial court responded, "Overruled, at this stage there has been nothing to describe what we were discussing."

The State then asked Crider if she was "fairly close to the person that [she] identified as [defendant]?" She said, "Yes." The State then asked her to "point to the man that you believe to be the one that you saw at the party." She pointed to defendant.

Without objection, Crider also testified that defendant approached victim and asked her out on a date. Victim said no. He then got mad and called victim "a stupid bitch."

Victim and her two girlfriends left the party around midnight. After they got in the car, defendant approached the car and asked if he could go with them. They told him no. Defendant then grabbed hold of the door handle wanting them to stay. They said no and took off with defendant holding onto the door handle.

■ Generally, evidence of prior uncharged misconduct is not admissible to show a propensity to commit the charged crime. However, such evidence is admissible to prove motive, intent, absence of mistake or accident, common scheme or plan, and identity of the person charged. *State v. Dudley,* 880 S.W.2d 580, 582 (Mo.App.E.D.1994). "Evidence of prior misconduct that does not fall within one of the five enumerated exceptions may nevertheless be admissible if the evidence is logically and legally relevant." *State v. Bernard,* 849 S.W.2d 10, 13 (Mo. banc 1993).

Even assuming this testimony was evidence of prior uncharged misconduct, it was still admissible. First, Crider's testimony that defendant "tried to kiss her" establishes he got close to her, thus giving her an excellent opportunity to see him. This was an issue because defendant claimed he was in Illinois on October 31. Thus, it was logically relevant. Further, its probative value outweighs its minimal prejudicial effect.

Second, Crider's testimony helps establish a motive for defendant to kill victim. Victim denied him a date and he was angry about it. The trial court did not err in overruling defendant's objection to this testimony.

■ The second incident also concerned events on October 31, and involved a rebuttal witness, Doug Brantley. In anticipation of Brantley's testimony, defense counsel objected "to anything about ... any type of crime or criminal activity." He also objected because Brantley's testimony was "utterly irrelevant and completely prejudicial."

The State argued the evidence was to rebut defendant's evidence that he was in Illinois on October 31. Further, counsel said this witness observed defendant with a handgun, similar to the murder weapon. He argued that possession of this handgun in Cape Girardeau seven days before the murder was also relevant, due to Cape Girardeau's close proximity to Benton.

In addition to this testimony, the witness apparently could testify that defendant was "shooting" in front of a billiard's parlor. The trial court sustained the objection to "any threats or any commission of any crime." It said it was "trying to limit the offense of what he did with the gun." However, it overruled the objection to the "gun and gun identification and things of that nature."

Brantley testified that he, his wife, and three friends arrived at the billiard's parlor around 10 p.m. on October 31. As they left around 1:00 or 1:30 a.m., defendant, who was intoxicated, and two friends followed them out the door. Defendant yelled at Brantley, asking if his wife and sister-in-law were "head-giving whores."

Brantley and defendant exchanged words as defendant and his friends went to their truck. Brantley said, "Why don't you just get into your truck and leave now." Defendant responded, "Fat boy, I'll kill you." At some time during this exchange, Brantley testified he saw defendant with a black handgun with a rectangular barrel. He said it was the kind that uses a clip.

■ Prior uncharged misconduct evidence may be relevant for purposes other then establishing propensity. In such a situation, "the evidence should not be rejected merely because it incidentally shows the accused to be guilty of another crime." *State v. Tomlin,* 830 S.W.2d 31, 34 (Mo.App.W.D.1992).

In the case before us, the objected to evidence was relevant. It established defendant's presence in Cape Girardeau when defendant's evidence was that he was in Illinois. His possession of a handgun, similar to the one used, a week before the murder was also relevant.

Further, it is the only evidence that defendant had a weapon before the murder. Also, it tends to support Grah's testimony that defendant had a .380 Barretta.

The trial judge went to great lengths to minimize the evidence of criminal activity involving the gun. We find no abuse of discretion. Point denied.

IV. Ineffective Assistance of Counsel

In his third point, defendant claims, "the trial court plainly erred in sentencing appellant ... because such action violated appellant's right to effective assistance of counsel." He contends his trial counsel did not act as

reasonably competent attorneys in three particulars.

As previously stated, the exclusive remedy for a claim of ineffective assistance of counsel is through a Rule 29.15 motion. *Wheat,* 775 S.W.2d at 157–58. Defendant did not file such a motion, and therefore this claim is not cognizable. Point denied.

## V. Gang Member Evidence

■ In his fourth point, defendant claims the trial court erred by allowing evidence that he was a member of the All Mighty Latin Kings street gang. He argues that the sole purpose of such evidence was to inflame the jury. He contends it is reasonably probable that the jury found him guilty because of his status as a gang member rather than on the evidence.

A state trooper went to Kankakee, Illinois to pick up defendant after he was arrested. The trooper advised him of his *Miranda* rights. En route to Missouri, the trooper asked if defendant was a member of the Latin Kings gang. Defendant said he was and that his gang name was "Quick." Further, he said that he did not own a gun, but "he and the other members have access to guns anytime that they want them." Also, he said he did not carry a gun because when gang members wear their colors and walk down the streets of Kankakee, police stop them and pat them down for weapons.

As mentioned in section I, another witness, Grah, testified that he and defendant were members of the All Mighty Latin Kings. He said defendant told him of the murder "[b]ecause he was a brother in the Latin Kings and he felt that he could confide in a brother."

Another witness, Mangus, also mentioned the gang. This reference was made in explanation of why he gave conflicting statements concerning defendant. Two other witnesses made minimal reference to gangs.

We first observe that the trial court did not permit the State unlimited latitude on this issue. Rather, it carefully limited the State's inquiries.

At trial and here, defendant relies primarily on *People v. Cardenas,* 31 Cal.3d 897, 184 Cal.Rptr. 165, 647 P.2d 569 (1982). In *Cardenas,* the prosecutor was permitted to attack defense witnesses' credibility by eliciting testimony from them that they and the defendant were members of a gang. *Id.,* 184 Cal.Rptr. at 167, 647 P.2d at 571. The evidence was offered to establish their possible bias. *Id.* at 168, 647 P.2d at 572. Because other evidence already established this possible bias, the "probative value of the gang membership evidence was minimal at best." *Id.* The *Cardenas* court reversed, holding the substantial danger of undue prejudice outweighed the limited probative value. *Id.*

Unlike *Cardenas,* here the evidence of defendant's gang membership was relevant and had substantial probative value. It showed defendant had access to guns at any time without requiring registration or purchase from a state licensed dealer. Also, it helps show why defendant confided in Grah, and why Mangus gave conflicting statements.

■ The trial court is vested with discretion to determine whether evidence is relevant and whether its probative value outweighs prejudicial dangers. We will not disturb its decision unless its discretion is abused. *State v. Richardson,* 838 S.W.2d 122, 124 (Mo.App.E.D.1992).

The probative effect of this evidence helps tie together key issues in this case. The trial court did not abuse its discretion in admitting the limited amount of testimony concerning gangs. Point denied.

## VI. Instructional Error

■ In his fifth point, defendant claims the trial court erred in overruling his objection to instruction number 19. He contends this instruction improperly told the jury it could "only consider prior inconsistent statements of a witness as such statements related to the witness' credibility and not as substantive evidence."

At the instruction conference, the trial court indicated its intention to give instruction number 19, patterned after MAI–CR 3d 310.16. Defendant made only a general objection at that time.

Instruction number 19 as submitted to the jury stated:

> There was testimony that a witness in this case on some former occasion made a statement inconsistent with his testimony in this case. Such testimony was admitted solely as it might bear on the question of the believability of that person as a witness in this case and should not be considered by you as evidence of the matters contained in the statement.

Notes on Use 7 to MAI–CR 3d 310.16 states that this instruction would not be given in certain cases. This conclusion is mandated by § 491.074 which provides that prior inconsistent statements of witnesses are admissible for the truth of the matter stated for certain offenses, including homicides.

The State concedes that giving the instruction was error. The giving of an instruction in violation of any applicable Notes on Use constitutes error. Rule 28.02(f). Pursuant to that rule, we are required to determine the prejudicial effect of the error. *Id.*

At the time of trial, defendant's attorney made a general objection to all instructions. No objection was made that either the statute or Notes on Use precluded the giving of instruction number 19. That objection first appeared in the Motion for New Trial.

At the time of trial, then Rule 28.03 [3] provided that objections to instructions made at trial "may be supplemented or enlarged in motions for new trial." However, our supreme court recognizes that defense counsel's "failure to object is a factor to be considered in determining prejudice." *State v. Livingston,* 801 S.W.2d 344, 349 (Mo. banc 1990).

Defendant asserts that prior inconsistent statements given by Shawn Mangus and Wade Howard should have been considered as substantive evidence. At trial, these two witnesses testified that defendant admitted killing victim. As discussed under defendant's first point, each gave prior inconsistent statements to defense counsel recanting earlier statements given to law enforcement officials.

Defendant was not prejudiced by instruction number 19. Chuck Weissinger presented essentially the same information contained in Mangus' prior inconsistent statement as substantive evidence. Weissinger testified that he, Mangus, and Grah conspired against defendant. They attempted to get lighter sentences for themselves by telling law enforcement officials that defendant admitted committing the murder in this case.

Moreover, defense counsel did not base his closing argument on the believability of the prior inconsistent statements. Rather, the major emphasis of defense counsel's closing argument was the credibility of witnesses. He attacked the credibility of not only the state's witnesses, but also his own witness, Weissinger.

Defense counsel commented, "I don't know if I believe Weissinger. I certainly don't believe those other three." Later, counsel argued, "But, I will tell you one thing, I wouldn't trust any of the four of them around the block or penny's on a dead person's eyes. Any of the four would steal them. They would say or do anything to gain favors."

Finally, neither State nor defense counsel specifically mentioned instruction number 19, nor mentioned or argued the substance of that instruction. As indicated, defense counsel's argument was based on discrediting witnesses and creating reasonable doubt. Under the circumstances, defendant was not prejudiced by instruction number 19. Point denied.

## VII. Grand Jury Minutes

▆ In his sixth point, defendant claims the trial court erred by failing to grant a mistrial when the State failed to comply with the trial court's order to disclose grand jury minutes.

Early in the discovery process, defendant requested the State to produce the grand jury transcripts or minutes relating to all witnesses the State intended to call at trial. Two months before trial, when defendant had not received the minutes, he moved to com-

---

**3.** The supreme court amended rule 28.03, effective July 1, 1995. The amended rule requires specific objections to instructions "before the jury retires to consider its verdict."

pel their production. The trial court sustained the motion. However, the Scott County Prosecuting Attorney never complied.

The matter was brought up again the morning trial began. Following voir dire and before the jury was sworn, the prosecutor said she had looked for them and could not find them.

In the argument portion of his brief, defendant says he "requested a mistrial." He refers us to transcript page 510. Nothing on that page, or the two adjoining pages concerning the grand jury minutes, contains a request for a mistrial.

In fact, on page 510, the trial court asked defense counsel, "What relief are you requesting?" Although counsel replied and made comments, he did not ask for any relief.

Defendant's brief refers us to two other transcript references where the subject was mentioned. Neither contains a request for a mistrial or any other specific relief.

The issue again arose when the trial court took up the motion for new trial. In response to defendant's argument, the State argued that defendant was not prejudiced because he deposed "the witnesses who actually testified before the grand jury." Although defense counsel replied to some arguments, this subject was not raised again. Thereafter, the trial court denied the motion for new trial.

We do not condone the Scott County Prosecuting Attorney's failure to timely furnish the grand jury materials. If they were timely furnished, they would not have been lost as the prosecutor later represented to the trial court.

■ Assuming that the grand jury materials were discoverable, a defendant is not entitled to a new trial for the sole reason that the prosecutor failed to comply with required discovery. Even if disclosure is required, a new trial will be granted only if the undisclosed evidence is "material." *Hayes v. State,* 711 S.W.2d 876, 879 (Mo. banc 1986). Evidence is material, "only if there is a reasonable probability that, had the evidence

been disclosed to the defense, the result ... might have been different." *Id.* (emphasis omitted) (quoting *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 3385, 87 L.Ed.2d 481 (1985)).

In the case before us, it is difficult to characterize the missing evidence as material. Defendant apparently deposed all witnesses that appeared before the grand jury. In addition, the State informed defendant that the testimony was narrative and the specifics were not in the notes. Finally, defendant does not show any prejudice beyond the failure of the State to produce the material. Point denied.

## VIII. In-court Identification

■ In his seventh point, defendant claims the "trial court plainly erred in failing to exclude the in-court identification of [him] by Mark Abbott because such identification was tainted by an impermissibly suggestive photographic lineup." He bases his complaint on the allegation that defendant's picture was the only one "in the array with the words 'police department' imprinted thereon."

Defendant did not preserve this error at trial. Thus, as requested, we review only for plain error under Rule 30.20.

In the motion to suppress hearing, one of the law enforcement officers who showed the photographic lineup to Abbott testified. He said he told Abbott to read the instructions contained on the folder and see if the person Abbott saw that night at the scene was shown. The officer said that Abbott did not wait to read the instructions, but "pointed directly to [defendant's picture] and said, 'That's him.'" Further, the officer said there was no hesitation from the time he handed the display to Abbott until he pointed to defendant's picture.

Abbott also testified at the suppression hearing. He said it "took seconds" for him to make the identification. At trial, he was asked if he picked defendant's picture because "there is some language about some police department." He replied, "No." He said he was not even aware of that language being on the bottom of the picture until

defense counsel pointed it out to him at an earlier hearing.

 To be entitled to relief, defendant must show that (1) the procedures were impermissibly suggestive, and (2) the suggestiveness of the procedure made the identification at trial unreliable. *State v. Vinson,* 800 S.W.2d 444, 446 (Mo. banc 1990). In making our determination, we look to the totality of the circumstances. *See State v. Higgins,* 592 S.W.2d 151, 159 (Mo. banc 1979).

In the instant case, all six photographs are similarly framed and of similar quality. The individuals in the photos are consistent in age and build. However, defendant's is the only photograph that shows the words "police department," albeit the words are faint and blurred. It is questionable that those words alone make the photo lineup unduly suggestive. *See State v. Neal,* 849 S.W.2d 250, 258 (Mo.App.E.D.1993).

Nevertheless, we reviewed the record to determine whether the identification was unreliable. It was not. Abbott's identification was immediate and certain. Further, he said he was not even aware of the words on the picture until the suppression hearing, months after he made his identification. No manifest injustice occurred. Point denied.

### IX. Autopsy Photographs

 In his final point, defendant claims the trial court abused its discretion by admitting autopsy photographs of the victim. He contends they were "cumulative, repetitious, gruesome, and unduly inflammatory."

 The trial court has broad discretion in the admission of photographs. *State v. Feltrop,* 803 S.W.2d 1, 10 (Mo. banc 1991). Photographs, although gruesome, may be admitted to show the nature and location of wounds, to help the jury better understand testimony, and to aid in establishing any element of the State's case. *Id.*

In the instant case, the State introduced the photographs to help explain the testimo-

ny of its pathologist. We find no abuse of discretion. Point denied.

The trial court's judgment is affirmed.

REINHARD, P.J., and AHRENS, J., concur.