**STATE of Missouri, Respondent,**

v.

**Michael Brian LONG, Appellant.**

**Michael B. LONG, Appellant,**

v.

**STATE of Missouri, Respondent.**

Nos. 20456, 21286.

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 20, 1997.

Ellen H. Flottman, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Daniel G. Cierpiot, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

A jury found Appellant guilty of two felonies:

Count I: assault in the second degree, § 565.060.1(2), RSMo Cum.Supp.1993;

Count II: armed criminal action, § 571.015.1, RSMo 1986.

The jury assessed punishment at six months' imprisonment on Count I and three years' imprisonment on Count II. The trial court imposed those sentences, ordering that they run concurrently. Appellant brings appeal 20456 from that judgment.

While that appeal was pending, Appellant filed a motion to vacate the judgment and sentences per Rule 29.15.[1] The motion court denied relief after an evidentiary hearing. Appellant brings appeal 21286 from that judgment.

We consolidated the appeals, Rule 29.15(*l*), but address them separately in this opinion.

## Appeal 20456

The first of Appellant's two points relied on pertains to this appeal. It avers the evidence was insufficient to support the verdicts.

The standard for appellate review of the sufficiency of the evidence to support a conviction is stated in *State v. Grim*, 854 S.W.2d 403 (Mo. banc 1993), *cert. denied*, 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). The appellate court accepts as true all evidence favorable to the State, including all reasonable inferences drawn therefrom, and disregards all evidence and inferences to the contrary. *Id.* at 405[1]. Review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the accused guilty beyond a reasonable doubt. *Id.*

The *Grim* standard echoes the due process standard announced by the Supreme Court of the United States in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *Grim*, 854 S.W.2d at 405.

Viewed favorably to the verdicts, the evidence showed that between 3:00 and 3:45

---

1. Rule references are to Missouri Rules of Criminal Procedure (1995). That is because Appellant was sentenced September 8, 1995, and his motion for post-conviction relief was filed November 28, 1995. The current (1997) version of Rule 29.15(m) provides that in such circumstances, post-conviction relief is governed by the version of Rule 29.15 in effect when the motion for post-conviction relief was filed.

a.m., July 27, 1994, Terry Lynn Smith and Ricky Lee Boone were inside the residence of Smith's parents in Springfield. Smith heard "loud music" outside. He and Boone went out. They saw a truck; two occupants were in it.

Smith noticed the passenger was wearing a blue bandana "right below the eyes, across the nose." According to Smith, the passenger said, "Come out to the truck, I've got something for you."

Boone quoted the passenger as saying, "Come out here, I want to show you something."

Both Smith and Boone described the passenger's voice as male; both characterized its tone as "mad."

Smith told the jurors that someone in the truck called him a "slob." The ensuing segment of Smith's testimony is the basis of Appellant's claim of error in appeal 21286. To maintain continuity in narrating the evidence, we set forth the dialogue now:

"Q. Does that word slob mean anything to you?

A. Not really, just—I guess it's some kind of gang related.

Q. All right. Is it a derogatory phrase for a gang?

[Appellant's lawyer]: Objection, leading.

THE WITNESS: Yes.

THE COURT: Sustained as leading.

Q. (By [Prosecutor]) Let me rephrase it. Do you know what it is supposed to mean?

A. Yeah.

Q. And what does it mean?

A. It's something they call like a Blood, like a slob, you know, it's kind of—I don't know.

Q. Is it supposed to be an insult or—

A. Yeah, pretty much.

Q. Were you a member of the Bloods?

A. No, I just associated with some.

Q. You knew some?

A. Yeah.

Q. And what color do Bloods usually wear?

A. Red.

Q. And who are their opponents, so to speak?

A. Usually the Crips.

Q. What color do the Crips wear?

A. Blue."

Boone told the jurors he and Smith tried to tell the passenger to get out of the truck. Boone explained: "I didn't trust it. I could tell he was up to something."

Boone and Smith approached the truck. It began moving away. Boone saw "somebody hanging out the [passenger] window . . . looking back at us."

Boone and Smith saw two or three "sparks" come from the passenger window. Simultaneously, they heard sounds.

Smith described the sounds as, "Blam, blam, blam."

Boone described the sounds as "a little popping noise." He concluded, "It was a little gun."

The truck proceeded to a corner, turned, and disappeared.

Smith's father called the police.

Officer Kelly Roth of the Springfield Police Department was on duty in a marked patrol vehicle. He received a dispatch about the incident, including a description of the truck.

Roth started north toward the scene. En route, he saw a southbound truck approaching him. It matched the description in the dispatch.

Roth turned around and began following the truck at a distance of about twenty feet. He did not activate the emergency lights on his vehicle, but did focus his spotlight on the rear of the truck. The truck contained two occupants.

As the truck went past a quarry, Roth saw the passenger extend his arm outside the window and throw a gun toward the quarry. The gun struck a fence and "bounced into the grass."

Roth explained that "a big pool of water" is in the quarry. Had the gun cleared the fence, the gun would have gone "down into

the water." According to Roth, "It's a pretty deep pool."

Roth radioed headquarters and requested a unit to stand by the gun site until he could return. Roth continued following the truck.

The truck eventually stopped at a house where the driver lived. Roth directed the occupants to remain in the truck until other officers arrived. Upon their arrival, Roth removed the driver and the passenger from the truck. The passenger was Appellant.

Roth searched the truck and found a live "twenty-five caliber round" on the floor between the passenger seat and the door. He also found a blue bandana in the glove compartment.

Roth then returned to the site where Appellant jettisoned the gun. An officer was protecting the area.

Roth immediately found an Excam twenty-five caliber semiautomatic pistol. It was cocked; a live round was in the chamber. Four rounds were in the magazine, which had a seven-round capacity. The bullets in the pistol were the same brand and caliber as the one Roth found in the truck.

At trial, Smith and Boone were shown photographs of the truck from which Roth removed Appellant and the bullet. Smith and Boone identified the truck as the one from which the shots were fired.

Count I was submitted to the jury on a verdict-directing instruction hypothesizing Appellant attempted to cause physical injury to Boone by means of a deadly weapon by shooting at him.

Appellant's first point avers the evidence was insufficient to support that hypothesis "in that the evidence showed at most that [Appellant] fired a gun, but did not establish that he thereupon attempted to cause physical injury to ... Boone, because the evidence did not prove that [Appellant] pointed the gun at [Boone] when he fired."

The point tacitly concedes the evidence was sufficient to support a finding that Appellant is the person who fired the shots described by Smith and Boone, and that Appellant fired them from the pistol recovered by Roth near the fence abutting the quarry.

We hold the evidence amply supports such a finding.

The pivotal issue, as recognized by Appellant, is whether the evidence was sufficient to support a finding that he fired the shots in an attempt to cause physical injury to Boone.

On that subject, Appellant points out that Smith conceded on cross-examination that he never saw a gun, hence he had no idea which direction it was pointing. Appellant also reminds us that Boone avowed he could not see a gun, and Boone further testified: "He could have been shooting in the air for all I knew ... I just seen ... the shots, the sparks."

The State responds by directing us to the following exchange during the prosecutor's redirect examination of Boone:

"Q. ... Do you recall talking to Bob Alexander [an investigator] from our office on September the 1st, 1994, at 8:33 in the morning, and telling—this was the question:

'When they drove off and you heard and saw the shots fired, could you tell which direction the weapon was pointed?

'Answer: It was pointed in our direction.'

Do you recall making that statement?

A. I don't really recall it, but like I said, you know, he was pointing in our direction from what I seen, you know. The gun—I don't know if the gun was in our—but he was.

Q. Pointed in your direction?

A. Yeah, he was pointed back and looking back at us.

. . . .

Q. ... do you recall telling [Alexander], on September 1st, 1994, on that tape, that the gun was pointed in your direction?

A. It's hard to say. I don't remember saying it, no.

Q. Would it help for us to play the tape for you?

A. It doesn't matter. I mean, you can play it, but I don't remember saying it.

. . . .

Q. ... Mr. Boone, you've had a chance to refresh your memory by looking at a transcript of a statement you gave our investigator on September 1, is that correct?

A. Yes.

Q. And at this time, again, I'll refer you back. Did you tell him at that time that the gun was pointed in your direction?

A. Yes."

Section 491.074, RSMo 1994, reads:

"Notwithstanding any other provisions of law to the contrary, a prior inconsistent statement of any witness testifying in the trial of an offense under chapter 565 ... RSMo, shall be received as substantive evidence, and the party offering the prior inconsistent statement may argue the truth of such statement."

■ Because of the above statute, Boone's statement to Alexander that the gun was pointed in Boone's direction was substantive evidence of where the gun was aimed. *State v. Bowman,* 741 S.W.2d 10, 12–13[1] and [2] (Mo. banc 1987), *cert. denied,* 488 U.S. 829, 109 S.Ct. 83, 102 L.Ed.2d 60 (1988); *State v. Pickens,* 780 S.W.2d 355, 356[1] (Mo.App. E.D.1989). The weight to be given Boone's statement to Alexander was for the jury. *Bowman,* 741 S.W.2d at 13.

■ In addition to Boone's statement, the evidence showed Appellant tossed the pistol toward the quarry when Roth, in a marked patrol vehicle, began following the truck in which Appellant was riding. Appellant's attempt to dispose of the pistol was a factor the jury could consider as showing consciousness of guilt. *State v. Leisure,* 810 S.W.2d 560, 571–72[21] (Mo.App. E.D.1991); *State v. Harris,* 602 S.W.2d 840, 845–46[15] (Mo.App. W.D.1980).

The jury could have reasonably found that when Appellant cast the pistol away, he surmised one or more of the shots had hit Boone or Smith and wanted to rid himself of incriminating evidence. The prosecutor argued

that inference to the jury. The jurors could have reasonably inferred that had Appellant fired the gun into the air to merely intimidate or agitate Boone and Smith, Appellant would not have discarded it.

Furthermore, there was evidence that Appellant coaxed Boone and Smith to approach the truck. The jurors could have reasonably inferred that Appellant wanted to shorten the distance between himself and Boone and Smith to increase the likelihood that the shots would find their mark.

■ We hold the evidence, viewed favorably to the verdicts, was sufficient to support them. Appellant's first point—the only claim of error in appeal 20456—is denied.

Judgment affirmed.

### Appeal 21286

Appellant's second (and final) point avers the motion court clearly erred in denying post-conviction relief in that Appellant received ineffective assistance of counsel at trial. The point proclaims Appellant's lawyer ("Defense Counsel") was derelict in failing to object to "evidence regarding [Appellant's] possible gang involvement."

Although the point does not identify the specific evidence toward which it is directed, we glean from the argument following the point that it is based on the testimony of Smith which began with the prosecutor's question about the meaning of "slob." That segment of Smith's testimony is set forth earlier in the section of this opinion addressing appeal 20456. For convenience, we henceforth refer to that testimony as "Smith's Bloods/Crips testimony."

Defense Counsel testified in the motion court that he filed a motion in limine in the trial court seeking to bar the prosecutor from presenting evidence of "possible gang affiliations of [Appellant]"; however, the trial court denied the motion.

Defense Counsel further testified that after his first objection to Smith's Bloods/Crips testimony was overruled,[2] he did not object

---

2. Defense Counsel's recollection was inaccurate. As shown in Smith's Blood/Crips testimony, quoted *supra,* Defense Counsel's only objection was that the prosecutor's question was "leading." The trial court *sustained* that objection.

again because he "didn't want to draw the jury's attention to it any more than I felt it already had been."

Defense Counsel conceded he knew his failure to object "makes [the issue] unpreserved for appeal." However, he explained:

> "My concern at the time of trial was an acquittal or a conviction. I did not want to draw the jury's attention to the gang-related activities any more than I had to, and I felt every mention of it by [the prosecutor], and my standing up and objecting in front of a jury would in fact draw their attention to it and make us look concerned."

The motion court held:

> "The Court finds that [Defense Counsel] was not ineffective in failing to 'object and properly preserve for appellate review the trial court's denial of movant's motion in limine to keep out any evidence, statements, argument or references to "gang" activities.' The record reflects that [Defense Counsel] filed such a motion in limine, and that it was overruled. However, [Defense Counsel] testified that, once the information was before the jury, he was reluctant to object too much, both because he did not want to further draw the jury's attention to the issue and because he did not want the jury to believe the defense was 'afraid' of such evidence. The Court finds that [Defense Counsel's] decision was trial strategy, and therefore may not be the basis of a motion for post-conviction relief."

■ Our review of the motion court's denial of relief is limited to a determination of whether its findings and conclusions are clearly erroneous. Rule 29.15(j); *State v. Tokar*, 918 S.W.2d 753, 761[2] (Mo. banc 1996), *cert. denied*, —— U.S. —— 117 S.Ct. 307, 136 L.Ed.2d 224 (1996).

■ To prevail on a claim of ineffective assistance of counsel, a prisoner seeking post-conviction relief must show: (1) his lawyer failed to exercise the customary skill and diligence that a reasonably competent lawyer

would have exercised under similar circumstances, and (2) the prisoner was thereby prejudiced. *Sanders v. State*, 738 S.W.2d 856, 857 (Mo. banc 1987).

The Supreme Court of Missouri recognizes that in many instances, seasoned trial lawyers do not object to otherwise improper questions for strategic purposes. *Tokar*, 918 S.W.2d at 768. It is feared that frequent objections irritate jurors and highlight the testimony complained of, resulting in more harm than good. *Id.*

■ Here, Defense Counsel testified his failure to persist in objecting to Smith's Bloods/Crips testimony was trial strategy. There is a presumption that such strategy was sound. *Id.* at 766[20].

■ It was Appellant's burden to prove his claim of ineffective assistance of counsel by a preponderance of the evidence. Rule 29.15(h); *Clemmons v. State*, 795 S.W.2d 414, 416[2] (Mo.App. E.D.1990), *cert. denied*, 500 U.S. 907, 111 S.Ct. 1689, 114 L.Ed.2d 83 (1991). That burden required Appellant to overcome the presumption that Defense Counsel's failure to persist in objecting to Smith's Bloods/Crips testimony was sound trial strategy. *State v. Stepter*, 794 S.W.2d 649, 656[17] (Mo. banc 1990). The motion court's findings demonstrate the motion court concluded Appellant failed to overcome that presumption.

On this record, we cannot declare the motion court's findings clearly erroneous. Defense Counsel's decision to forego objecting to Smith's Bloods/Crips testimony is an archetypal instance of a strategic decision by counsel. As Defense Counsel clearly articulated in the motion court, "My concern at the time of trial was an acquittal or a conviction." The trial court had earlier denied the motion in limine, and there was no assurance that receiving Smith's Bloods/Crips testimony over an objection renewing the grounds in the motion would have been held reversible error on appeal.[3] *See: State v. Kezer*, 918 S.W.2d 874, 880[9] (Mo.App. E.D.1996).

---

Defense Counsel voiced no further objection during Smith's Bloods/Crips testimony.

**3.** The motion in limine asserted that evidence such as Smith's Bloods/Crips testimony was irrelevant and extremely prejudicial. The prosecutor argued to the jury that Smith's Bloods/Crips

The motion court's denial of relief is affirmed.

GARRISON, P.J., and PREWITT, J., concur.

testimony revealed the motive for the shooting. We infer that is because Smith testified he associated with members of the Bloods, while the blue bandana (which the jury could have reasonably found Appellant was wearing when he fired the shots) was a badge of the Crips. Appellant cites no case demonstrating it was reversible error to receive such testimony as evidence of motive.